The next case on the docket is 5-20-10 McKinney v. Newgent. Arguing for the appellant, Daniel Nugent, is Joel Beckwith. Arguing for the appellee, Tyree McKinney, is Kristi Cooksey and Michelle Rich. Each side will have up to 20 minutes for their argument. The appellant will also have up to five minutes for rebuttal. You'll see the please remember no photographs and only the clerk of the court is permitted to record these proceedings today. Good afternoon. Before we begin, Mr. Beckwith, have you been informed that Ms. Cooksey and Ms. Rich intend to split their time? I have not, your honor. Okay, do you have an objection to that? No, your honor, I don't. Okay, I just wanted to make sure you courtroom these days. Right. Okay, it won't be a back and forth as I understand it, Mr. Beckwith. It will just be when one stops, the next will begin, but they will still have the same amount of time as you do. Fair enough. Okay, if you're ready to proceed, Mr. Beckwith, go ahead. Okay, thank you, your honor. May it please the court. I'll go ahead and proceed with the facts of this case. If the court's not highly familiar with the facts, basically this is a lawsuit which was filed by the plaintiff for some personal injuries dating back to 2018 car accident. Our client, Daniel Nugent, was driving and rear-ended the plaintiff's vehicle. Now, there was a case management order which was issued in this case back on September 17th, 2018, and that case management order specified the discovery obligations of the parties and when discovery was, particular discovery, was supposed to be produced. Now, in that order, it stated that plaintiff was required to serve their rule 213 discovery questions and interrogatories by April 15th, 2019, which did not occur. Let me ask you that. Are you telling me the plaintiffs did not submit any interrogatories to you? No, your honor. They did. However, they did not do so until October 11th, 2019. So, the very first set of interrogatories that you received as a defendant was October 11th? Not general interrogatories we did receive before this occasion. Rule 213 interrogatories, the expansive set of discovery which was requested from our expert, Dr. Peter Anderson, was not sent until October 11th, 2019. I apologize. I could not find in the record the original interrogatories that were submitted to you because it says that discovery had been initiated by the time September 17th came along with the case management order? Right. And what I'm asking is, included within the plaintiff's general interrogatories to you, their very first ones or whatever, was there any question asking under 213F for your expert witnesses? Your honor, I do believe from the very best of my recollection, there was one rule 213 interrogatory. However, I cannot remember the specific interrogatory and what was asked. I know that those interrogatories were not used as exhibits by either party in this case to the best of my knowledge. Okay. Thank you. So, basically, your honors, this case proceeded on discovery matters and the defense proceeded to collect the medical records which the plaintiff had acquired from his treatment. And we ran into a few setbacks and delays. First, we requested some records from Memorial Medical Group and these records were eventually sent. However, there were records which were missing and it turns out there was a clerical mistake and at least one record was not included in this packet which was sent. I notified plaintiff's of this situation. I believe it was the end of April. I want to say April 24, 2019. I said, this is the situation. We don't have all the records. We've got to re-request them. So, we did do that and sometime later, we did receive all of the medical records. Well, let's wait. Let's let me interrupt you there. Your brief says that you or one of your on May 1 when you realized that the records were incomplete, correct? I believe that's accurate, Judge. Yes. But you didn't follow up until July 15. So, May, June, 60 days, 75 days, it took you to realize nobody had answered? Well, with regard to when we had actually received all of the medical records from plaintiff, we weren't actually able to confirm that all records were in our possession until that time in July. So, we were able to confirm that there was a missing provider, a PA, which was listed on the medical records from Memorial Medical Group. We sent a second or a first request to them requesting these particular medical records from the PA and it turns out that the PA records were not separate and different from the records which we'd received. So, the inquiry was to get all the medical records from Memorial Medical Group. That's what we were striving to do. We didn't actually realize we didn't have or we had all the medical records until approximately July 15 when I sent an email to plaintiff's counsel and said, at this time, I believe we've got all these medical records. We're ready to proceed with a records review with Dr. Peter Anderson. Why didn't you take a deposition of the custodian and get it over with? You know, Judge, that certainly that would be a possibility. That's not something we typically do. Usually, we'll send a records request. We get it back anywhere from two to four weeks and that's what we usually will rely on. We'd like to avoid the extra expense of particular records or has some sort of, you know, objection to providing us with the full record. Did you get a set of these records from the plaintiff? I believe we, yes, we believe, I believe that we received at least two of the visits from plaintiff. However, I'm not completely sure if we received all of the medical records from the plaintiff. Okay. So, once we realized that we had all discovery of the plaintiff's treatment, which by the way, we were able to confirm that the plaintiff did not have a prior primary care doctor, which would have records that we could review. We had to rely on plaintiff's testimony that he just had started treating with Memorial Medical Group. Once we had obtained all these records, we said, we're going to proceed with a records review deposition of Dr. Peter Anderson and we're emailing you to let you know we've had some delays and setbacks. Now, this email, which was sent July 15th, we didn't get a response to that. So, we proceeded to take these records and send them over to Dr. Peter Anderson so he could review these records, which he, the process had begun for that. By the time August 15th rolled around, August 15th was the deadline to disclose the expert's report. We realized, look, we're not going to be able to have this report by August 15th. And I sent plaintiff's counsel a notice that we're filing a motion to extension of time. We'd like the court to grant this extension so that we can take the this motion until approximately six weeks later on October 1st, 2019. So, there was a big gap in time. I had originally went back and forth with plaintiff's counsel trying to schedule this hearing from the trial court, but it didn't happen. The court couldn't fit in its schedule. We got an October, an earlier date than October 1st. However, plaintiff's counsel had an objection. They had a conflict. So, we couldn't do it before October 1st. Now, this is 21 days before trial is set to begin. Did you go ahead and disclose the report? We did disclose the report as soon as it was in our possession, Your Honor, which I believe... What day was that? I believe that was September 22nd. Well, somewhere I saw that you argued that you disclosed four days after the time. What was that about? I'm not sure what exactly that's in reference to. I know that we did send Dr. Anderson's medical records review report within 30 to 31 days prior to the October 21st trial date. So, they had it at least 30 days before trial was set to begin. I understand. You sent the report September 20th on a Friday afternoon, as I recall, and then you sent a notice on Monday, the following Monday, for a video evidence deposition of your own expert? You know, Your Honor, I cannot remember the specific date which we sent the notice. However, I know that it would have been in anticipation of the ruling from the court, because the court did not rule on Dr. Anderson until October 9th, 2019. Well, regardless of what the court ruled, when did... So, there was no independent medical examination here, right? Correct, Your Honor. Okay. So, it was just a records review. Right. And when you filed your motion for an extension of time, you answered interrogatories, didn't you? You did a Rule 213 disclosure on 8-19. That was the four days. Right. So, on the 19th, you actually did a Rule 213 disclosure, right? Right. We did a basic Rule 213 disclosure that included Dr. Anderson, his name and address, what we anticipated that he would testify to, because obviously at that point, we had not yet received his report. And that's the disclosure I believe you're referring to. Well, this particular disclosure has no opinions in it. That's correct, Your Honor. Because at that date and time, we did not have Dr. Anderson's opinions in full, we didn't have his report, and his records review had not yet been complete. So, we did not have his opinions to disclose. But we wanted... Go ahead. I'm sorry. It's tough on Zoom, you know. It is. So, bear with me. So, I'm trying to find out if this disclosure was made in taking a chance and say, we're going to disclose him even though we don't know what his opinions are, or alternatively, had you made a good faith effort and you had talked to him so that you knew you were going to disclose him, but you just didn't have his report yet. We knew we were going to disclose him, but we... Regardless. Regardless, we knew at that point, we were going to disclose him. However, we did not yet have his opinions. And what we were waiting on by that point was how the trial court exactly would rule on our motion for extension of time. Because like I said, it was six weeks before we were actually received a ruling on that. Why would you wait? I didn't want to wait, Your Honor. I wanted a ruling as quickly as I possibly could. My question is, why would you wait to do anything more until the court rules? Why can't you, in good faith, continue moving along? Well, we tried to, Your Honor. I mean, we sent... What information we had regarding Dr. Anderson was sent to the plaintiff. This is what we had. This is what we know. I haven't personally discussed the case with Dr. Anderson at this point one-on-one. I don't know what his opinions are. This, in conjunction with the plaintiff violated the original case management order on at least two separate occasions. The plaintiff did not disclose their records from Dr. Rutz, which revealed a disc protrusion for the first time. The defense had no idea disc protrusion was involved in this case. We didn't find out until August 22nd, 2019. This was after the deadline to disclose. August 15th was the deadline. We didn't receive this record until August 22nd. It was supplemented by plaintiff's counsel. I thought you said you had obtained all the records. We had. Yes, we thought that we did. We weren't aware that there was an additional visit from Dr. Rutz between the time we had requested the records and the time that we had received them and made that statement to plaintiff's counsel. So we thought... So plaintiff's counsel was doing a seasonable update in anticipation. I mean they're under an obligation to seasonally update when their client goes to a doctor, right? Right, and I disagree that they made efforts to seasonally update. They were actually in possession of the records that we received on August 22nd, 2019. I believe they were in possession of those records as early as August 1st. So this disclosure from plaintiff occurred after the deadline and they definitely had these records before the deadline. That much is very clear and they didn't produce it. Okay, go ahead because I'll clear up the confusion with other counsel. Sure. So we proceeded to a jury trial, as you know, on October 21st. Well, wait, wait. Before you get there, I want to know a little bit more about what happened with your expert. So we received... When we received Dr. Anderson's medical records review, I believe we supplemented it just within a few days of receiving it. I believe it was September 22nd, 2019. That's the date that comes to mind. We sent that to plaintiff's counsel and said, here's his report. Now you have it. It's 30, 31 days until trial at this point. On October 1st, we have the hearing for Dr. Anderson and the motion for extension of time. Judge Gleeson actually rules on our motion for extension of time on October 9th, 2019. So it took approximately nine days before we received a confirmation that Dr. Anderson could even be deposed and allowed in this case. So we proceeded with... Well, scratch that. We received plaintiff counsel's extensive Rule 213 discovery on October 11th, 2019, which was just a couple of days after Dr. Anderson was allowed to testify. And we realized after looking at this discovery, and I argue this extensively in my brief, this is a massive amount of documents which are being requested, many of which have no timeframe, no date range whatsoever. This also goes for the they served a very extensive subpoena and there was not one date range listed within the subpoena to Ms. Wanda Hartsoe. Ms. Wanda Hartsoe, after receiving her subpoena on October 11th, 2019, immediately gets the documents she believes are responsive to these requests and she puts them in the mail. They're received by plaintiff's counsel, I believe it was Saturday. So we proceed with having the deposition... Scratch that. Monday, we had the pretrial, which was October 15th, 2019. At that time, the second order from Judge Gleason is issued regarding discovery for Dr. Anderson. Judge Gleason grants the plaintiff's motion for accelerated discovery and the defense is required to produce their answers and responses by 5 p.m. on October 15th, which we did do. Before 5 p.m. we sent the plaintiff documents, 461 pages to be exact of documents, correspondence, checks, his records review report, all records which were reviewed by Dr. Anderson. This was all sent to plaintiff before the 5 p.m. deadline. This was followed on the following morning, we received an email requesting from opposing counsel additional discovery documents including missing 1099s. I had already made an inquiry with Wanda Hartso regarding 1099s. 1099, she said, she's not involved in this, she's not aware of any 1099s and payments are always issued to Southwest Orthopedics, so she didn't believe any 1099s were actually available. So rely on this information, we didn't produce any 1099s. The following day, we get a request from opposing counsel. She wants to know where the 1099 is. I said I don't know about any 1099s, but I'll tell you what, I will look and I will go, our secretary has been on vacation, I'll go call her up, I'll say, do you know about any 1099s? And she said, well you can look. So I went through the records and reviewed, we found one 1099 from Southwest Orthopedics dated 2018. This is income which is paid from Free Our Carving Mandela at that time to Southwest Orthopedics for medical legal work of Dr. Anderson. It's not directed to Dr. Anderson individually. Now this is a new development to all of us because 1099s were only recently requested from Southwest Orthopedics, they don't traditionally do that. So once I realized we have the extra 1099, I do produce it by email along with a PDF file from some very old cases dating back to 2014. Financial information, correspondence, old checks. Now I didn't have to produce this, I objected, I didn't believe it was relevant, but I produced it anyway. So we send plaintiff's counsel massive amounts of information which is made available. They decide to proceed with Ms. Wando Hartso's deposition. Now they get some information regarding some missing checks. Ms. Wando Hartso testifies. Look, he does three things. He does medical reviews, IMEs, and he does depositions. Record reviews are not included in these lists. And they produced some checks which hadn't been included within this extensive list provided by Dr. Anderson. And the checks which they brought to Ms. Wando Hartso's attention actually only amounted to about $9,600. Now comparatively, we disclosed $200,150 of medical legal work from Dr. Anderson. So that $9,600 amount is less than 5% of the amount which was actually disclosed. And at the time of Dr. Anderson's deposition, he says he didn't know that these record reviews were not included in there. But he said, we're fixing it. We're putting together a new list. Dr. Anderson and Wanda Hartso had days, a matter of days, five days, to produce all the documents, the massive amount of documents which were requested by plaintiff's counsel, and also your runner. In this case, no 201K letter was issued or sent by plaintiff's counsel. No motion to compel was filed by plaintiff's counsel. And on the day of jury trial, we get a motion from plaintiff's expert, which obviously, as you now know, the judge decree it. So I can see my time is up. So I'll go ahead and yield to opposing counsel. Thank you. Before you yield, I just need to ask you one other question. Did you ever supplement your 213 disclosure to plaintiff's counsel? August 19, 2019, did you ever issue another 213 supplemental disclosure? Yes, your honor, we did. I've reviewed the date prior to today's deposition, but for some reason, it's not. I'm drawing a blank, your honor. I apologize. I believe it was just a matter of days after we received Dr. Anderson's report and supplemented the report to plaintiff's counsel. It would have been late September, possibly early October. But September 20th, ring a bell? That sounds like that might be it. September 20th was your disclosure of the report. Right. And you think that, Justice Boyd, you're looking at a document that says supplemental rule 213? I'm looking at the timeline I tried to get through on my own. And it looks to me like on the August 19th, there was a 213 disclosure that had no report. Right. And then the report was included on the September 20th. So I think maybe your question, Justice Cates, was, was there another supplement? Right. I've got the September 20th because I think that was on the Friday afternoon. But nothing else was ever, like all these documents that you're putting out, you didn't ever supplement those as a part of the record? Correct, your honor. We didn't actually respond with those documents until we were served and with the official rule 213 discovery, which was very, very extensive. And because this obviously it wasn't served until after the judge had made a ruling on Dr. Peter Anderson. Okay. Thank you so much. You'll have a few moments and minutes after plaintiff's counsel Apolli's argument. Okay, you ready to begin? Yes, your honor. Thank you. You may proceed. May it please the court, Justices, my name is Kristi Cooksey and I represent the plaintiff, Tyree McKinney. Just I'm going to start instead of where I plan to start with answering Justice Cates question with regard to rule 213 interrogatories. Our initial discovery requests were served on 821-18 and they were the standard Supreme Court rules in the appendix. So number 23 was verbatim to the one that's in the appendix to rule 213, which asks about rule 213 witnesses and all required information. There were also six requests to produce with regard to expert opinions or reports. We routinely, we routinely send those with our initial discovery responses or discovery requests to get the identity and opinions of any expert witness. It's only after that, that we decide whether or not based on those opinions and the identity of the experts, we're going to probe the bias of that expert. There's a lot of reasons for that, that expert might be favorable to our client, even if he's not, we may already have that information from another case, or we don't might not believe that the bias probe would assist our client. We had complied with that 415-18 deadline to serve rule 213 interrogatories eight months before the deadline came about. And Illinois law says that the outer limit to comply with the deadline on the CMO is that deadline. So we had done it eight months early. The response by defense was that they did not have one at that time, and they would supplement. No decision had been made, and that they would supplement. This issue has never been brought up until the appellate stage. In fact, if you look at the motions regarding expert discovery, you'll see that in every one of those plaintiff alleged that they had complied with every deadline. And there was no objection that we had, that we hadn't until the appellate stage. So I don't believe that would be appropriate on that basis, but we'd be happy to supplement with the record if the court found that necessary. Clearly, those are sworn statements by defense counsel. Ms. Cooksey, you know, when I read the case management order, the reason I asked that question about the original interrogatories is because this seems to me, at least, to be a very unusual case management order. Maybe this is the standard one that's being used by counsel now, but why would you have these separate interrogatory disclosures? Why can't everybody just send interrogatories? I don't understand the purpose of this plaintiff shall serve 213-F interrogatories. And that's before you even know if they have a witness. Can you help me with that? I just don't understand the requirement there. My basis for that is if for some reason we didn't put it in our original discovery, we need to ask by that time. So we did include it in our original discovery, but there might be a case, a premises case or something like that, where we didn't ask and we need to do that. Also in the record are our supplemental 213s that were issued on October 11th, 2019. The reason why they're supplemental is because we had already asked our original 213 interrogatories. In response to the appeal on this case, one of the most fundamental and basic rights in litigation is for a party to be able to probe the bias or prejudice of a witness. The credibility of any witness, especially an expert witness is critical to the search for truth and an understanding of the financial bias of an expert witness is so essential because the jury cannot perform its function to properly weigh witness testimony unless they have accurate information. This court and our Supreme Court is very well aware of the impact that an expert and that impact can be overstated. And that's why in Trower, the right was outlined and preserved that the opportunity to cross-examine expert bias, partisanship and financial interest is critical. The one date I think you should focus on and I think is really critical to this case is September 20th, 2019. This was the first date, 30 days before trial that defendant produced its expert opinions pursuant to Rule 213. At no time prior to that did plaintiff have any notice of 213 opinions and how they would impact the trial. That was 30 days before. On October 9th, 2019. What about their argument that they disclosed on August 19th that you knew that there was going to be this Dr. Anderson? Not only would it be my response that those 213 objections were wholly insufficient pursuant to Illinois law, but I believe Mr. Beckwith admitted that he threw those out there knowing that his real 213s came with that report. He didn't have the opinions until 9-20 and that is the fundamental right of information that a plaintiff would have with the 213 F-3 retained expert. So I would clarify for me if you can about these medical records. They couldn't get the medical records and that you kept supplementing. Can you clarify that? I will tell you that our responses to discovery were, let me see, I looked that up while you were talking. It's nice to be in front of a computer. Were sent with a settlement demand all records and bills on October 10th, 2018. And then I pulled up my client's medical list, which I'm going to do now because I've pulled up a couple other things. So give me just one second. My client saw Dr. Rutz on April 17th, 2019, and an MRI was ordered. That record was produced. I don't have that date. I believe at the beginning of May. The record that defense is complaining about and said we had on August 1st, that visit didn't happen until August 6th, 2019. So at the beginning of May, at the latest, they were aware that he had followed up with his treating physician and an MRI had been ordered. And at that 8619 visit, he was released from care. And we submitted that to defense counsel on August 22nd, 2019. So it would be plaintiff's position that they had all of the medical they needed to at least get a report from Dr. Anderson. Certainly, the current treatment records could have been provided him and he could have supplemented, but not to have any opinions until 30 days before trial, especially when defense counsel acknowledges that they thought my client saw PA, and he didn't. And we had sent that information and discovery responses that were verified and given them blank medical authorizations the year before. I think that's all a red herring. And why I think this is all a red herring is they got their deposition, they got their expert report allowed, Judge Gleason allowed them to take the deposition. And it was only because we didn't get that fundamental right to have the accurate information to discovery to cross examine Dr. Anderson, that we're even here. Because had Dr. Anderson done that, regardless of the timing, that opinion would have been allowed. And it's very what happened here. Because as soon as we got the discovery, the opinions, we asked for the financial information. We had seen Dr. Anderson before and knew that he would not give it to us. We we didn't take any chances. We submitted discovery requests, request for production, interrogatories, the subpoena do cease, take them to the records custodian. And even though Judge Gleason had very clearly said that defendant and defendants witness should comply and produce um, we didn't rest on our laurels. We actually made an emergency motion to compel that early so that we would have it hopefully and less than 48 hours before the evidence deposition. And what happened from plaintiff's perspective was was ridiculous, because and I'm sorry, that was what I don't want to be that way. But when they sent us the faxes at five o'clock, we knew it was incomplete, and it didn't comply with that spirit. Then we got calls, are you going to cancel the records deposition? Are you going to cancel? And we said, we think it's deficient. No, we need what do you need? What do you need? Well, we noticed there's no 1099. As we noticed this, we noticed that three hours before the deposition, I'll never forget because I'm starting trial on Monday, Wednesday afternoon at noon, I get 200 additional pages. And just a very brief comparison of the information, the list that Dr. Anderson provided with what defense counsel provided from their office showed that what Dr. Anderson provided was incomplete. And so at that point, we needed to take the records custodian deposition to be able to get the information our client was entitled to have. And during that records deposition, the admissions were overwhelming. Not only had she left out information that was in Mr. McKinney's file, but she had the information we asked for and simply said, no, I didn't get it. She mentioned lists and other computer programs such as Athena, Excel, items at the central billing office. And those subpoenas and those orders were to defendants witness and they were also to the company. So both, not only Dr. Anderson himself, but his practice were subpoenaed. So the fact that she didn't do anything to gather this information is an essential fact for this court. Judge Gleeson, I wish we had the October 1st hearing record. We don't, but it's clear from his order and what he said in the final pretrial that he very clear to defense counsel that this information would need to be provided. It's admitted in the record that defense counsel said, yes, he's done this frequently. It's clear from the evidence he's done this frequently over 30 times with defense counsel's office alone. We were likely more diligent than other plaintiffs councils and attempting to get this information. But what we found was a flagrant disregard for accurate, truthful discovery, which flies in the face of the litigation process. I can only imagine if the shoe was on the other foot and my client didn't produce things that he was supposed to, what, where we would be. And this is somebody who admits that he absolutely knew that Dr. Anderson absolutely knew the requirements. His office knew the requirements. His office was aware that we needed this information, aware that they had access to it and simply chose not to gather it provided the slats. Let me interrupt. It seemed in the court's transcript that the court knows this doctor that he's at least there was, I don't know this doctor, but there's, there was an insinuation that part of the reason judge Gleason ruled the way he did is because he knew this doctor. He must be a regular. Yes. And over 30 times with defense counsel's office alone and in what we were produced and granted the $9,000 in checks that he references, we can only imagine that that is actually complete because it was never provided. Those are just what we got from defense counsel. We didn't get anything from Dr. Anderson's office. So if that's just defense counsel, we can imagine what it would be, but judge Gleason asked defense counsel on the record, if that was the case. And they acknowledged that that was the case that this doctor is a frequent flyer, someone they've used frequently. And Dr. Anderson admitted that he was aware of these because he's been involved in this well from the documents in this, uh, in this case alone since 2013. Um, I like the Slatsky case because you want me to give you that Slatsky case, because it brings out the reason. One of the things that says is at any point during these events, defendant could have complied with discovery and avoided the sanction imposed. And I believe that that's the case here. Not only is that case extremely analogous to what we're going through here, but Illinois law presumes that they have control and full cooperation from the retained witness. And we see in the admissions and the depositions that these offices weren't even contacted or requested to get this information. Um, at this point, I think I will go ahead and turn it over to my partner, Michelle Rich, because I'm sure I'm leaving stuff out. Is that, is that all right? That's acceptable. You certainly do speak quickly though. I'm not sure you left anything out. Oh, I'm sorry. Yeah. I've been accused of that before. Oh no, you're fine. Absolutely fine. Ms. Rich. Thank you, your honors. May it please the court, uh, just a few things to follow up on. Since we're recording, would you state your name please? Oh, I apologize. Michelle Rich for the plaintiff, Tyree McKinney. Thank you, Justice Cates. So with regard to judge Gleason's rulings on this case, I think any review of his record, um, would show you that he gave the defense great deference and latitude. And just like the Fraser versus Jackson case, he gave them multiple opportunities to cure the deficiencies in their discovery responses. And they chose not to do that. And as a result, only then did judge Gleason make the decision to bar Dr. Anderson. As a result of that, there were two separate court orders, um, the October 9th order, as well as the October 15th court order. And on the record, judge Gleason made it extremely clear to defendant what he expected in terms of the production. And he indicated on the record quite clearly, again, that if defendant did not produce that that he was going to be reviewing whether Dr. Anderson was going to be allowed to testify in this case. And his, as I'm sure you're all aware, his decision in this case is subject to the highest possible standard there is an abuse of discretion. Um, I put a quote in our brief that I think is pretty appropriate that states that that standard of review, um, should be overturned only if the trial court acts arbitrarily without employment of conscientious judgment. Judge Gleason's decision-making and his conscientious judgment in this case, I think was impeccable. He gave the defendant numerous opportunities to cure that and they chose not to do it within the boundaries that the court set forth in terms of timing. Ms. Hartsoe, when we took her records custodian deposition just the week before trial, um, acknowledged to us, which is contrary to what Mr. Beckwith told you in his argument that she had never been contacted by defense counsel prior to, I think, two hours before her records custodian deposition was set to take place. It's clear that they did not make any attempt to contact Dr. Anderson's office to get this information, even though they were under two court orders to do so. Um, so that's, that's clear from her deposition testimony. And I would ask you to take notice of that. I think another thing that's quite noticeable and that the court relied on in this, in making this decision is that when I did take Dr. Anderson's video evidence deposition, um, which was just, again, a couple of days before trials was set to begin in this case, I asked him about records reviews specifically, because again, that's what he did in this case. I asked him if records reviews were included in the documentation that his office provided, his IME and deposition list. He initially testified that yes, it was included. And that's a direct quote that's in the record. Only when I then questioned him further, because I knew what we had learned from Ms. Hartsoe the evening before, did he say, oh, well, actually today, I became aware that that that's not in there. So if we had not proceeded with Ms. Hartsoe's depositions and the other discovery requests that we had made, Dr. Anderson would have intentionally tried to mislead me in his evidence deposition like he did. And I think that's significant. And that's why the court made the ruling that it did and gave them so many opportunities to fix that and they didn't do so. You know, when I read this case, I have to tell you that I was very concerned about the fact that all of this was going on, as I would say, minutes before trial. I mean, this is exactly what is not required under Rule 218. So my question to you is, and I recognize that the court was involved and you were doing all this, but the defendant says they did the best they could. I think Ms. Cooksey has explained that, you did this other thing. But I guess my question is, if you did have this number, $200,150 that had been paid by this defense firm, how was the plaintiff prejudiced in this case if Judge Gleason had not ruled to bar the expert? I mean, you did have a lot of information. You was a frequent flyer that could have come out before the court. You knew this particular firm paid a lot of money to this guy to review cases. Do you think prejudice plays a role in this at all? I absolutely do, Your Honor. And I think the significant fact in this case is that we still have no idea how much Dr. Anderson has made performing records reviews. We never got that number because they told us that they don't have it compiled and it wasn't produced, even though it could be, according to Ms. Hartsoe, if she would have actually complied with our subpoena and our multiple other requests, but she didn't. So we have absolutely no idea how much Dr. Anderson makes from performing records reviews, which is what they did to Mr. McKinney in this case. And that goes to the crux and the heart of 213F3 and the case law that we have from Trower and this is relevant information that is supposed to be disclosed by the defense. And Dr. Anderson says he's aware of this and has been for some time. So I think it absolutely prejudiced us in this case because we still have no clue as to even a remote idea of what this doctor is earning when he performs records reviews on plaintiffs in litigated cases. He also acknowledged that his at least one deposition from 2015 that he had given that wasn't on his list. So again, that's something that's significant in this case. This is not giving us a clear picture of this doctor. So I see that my time is just about to expire in a few seconds. I think clearly Judge Gleason's reasoning in this case was very thorough. He used extreme conscientious judgment. I don't think that is anything inappropriate about his rulings or the verdict of the jury in this case. I think the award was appropriate for what my client and his doctor testified to at the time of trial. So we would ask that the jury's verdict be affirmed. Thank you very much for your time. Thank you very much. Thank you both ladies for your arguments. Mr. Beckwith. Yeah, thank you, Your Honor. For my rebuttal, I'd like to point out that the plaintiff's counsel has made the argument, just as they made on the day of jury trial, that they were deprived of an opportunity to cross-examine Dr. Peter Anderson meaningfully. Now, this argument is categorically undermined by the fact that with the substantial information that they did have, no effort was made to question Dr. Anderson regarding any of the checks, any of the amounts which they claimed were missing. Now, significantly, opposing counsels that they have no idea which record reviews were included or how much Dr. Anderson made from records reviews. A problem with that argument is that Ms. Wanto-Herzo testified that included within the deposition list are depositions for both records reviews and IMEs. Now, we have an IME list and we have a deposition list. By process of elimination, you can determine which of those from the IME list were actually records reviews. Now, this was never attempted by plaintiff's counsel and when Wanto-Herzo testified, she could get plaintiff's counsel an updated list. This wasn't followed through. They didn't say anything. Well, how many days before trial was this, Mr. Bacor? Between Wanto-Herzo's deposition and trial, Your Honor, I want to say it was five to six days. Five to six days. The original CMO says that your expert had to have been or 215 examiner had to be made available for deposition by August 15th. That would be from the time your interrogatories, at least I'm reading the case management order. If they had produced to you additional 213 interrogatories on April 15th, you had four months before you had to give a deposition of your controlled expert. It doesn't even talk about, I'm sorry, your retained expert. It doesn't talk about controlled expert witnesses, but it does say defendants retained expert witness, if any, and 215 examiner shall be made available for deposition by August 15th. So, had you done that, they would have had four days to pursue this, not five days. That's correct, Your Honor. However, just as we argued earlier, we had delays which were beyond the control of the defense. We requested medical records. They didn't arrive. When did you first request medical records? I mean, they gave you discovery in October of 2018. They gave you blank medical authorizations in 2018. Your firm is a well-renowned firm. You know how to get medical records. What was the problem here? Judge, I can't give you an exact date when we actually mailed off a request with a HIPAA form. I can only tell you that by April 26th, 2019, which was the date which I initially emailed the closing counsel to let them know I was having some difficulties, that we definitely would have sent the request way before then. So, January, February, perhaps, but I don't know for sure. When did you take the plaintiff's treaters? One, which was the plaintiff's primary care doctor, very new primary care doctor. I believe that was taken in the summer. However, whether it was June, July, I'm not... Uh-oh. We lost him. We lost him in about a minute and 10. Can you stop the clock and I'll get him back in? Yeah. You can't put in... We'll give him a few more minutes. That's never happened before. Come on. Your Honor, I can't say exactly when we first began requesting medical records, but I am very certain that it would have been at least by very early 2019. Before my time is up, Your Honor, I'd just like to point out the fact that Dr. Anderson, if you read his transcript along with Wanda Hardstow, they both testified that they had a willingness to provide opposing counsel with a fixed list, one which contained all of the information which they could use to cross-examine Dr. Anderson. However, with the information that opposing counsel did have, they didn't proceed to ask Dr. Anderson any specific questions related to missing amounts. The checks which were identified in Wanda Hardstow's deposition could have been brought up to Dr. Anderson. That was not done. Opposing counsel has also argued that by the time that they supplemented their discovery with Dr. Rutz on August 22, 2019, that we had sufficient information to send to Dr. Anderson for his records review report. That's outrageous, to be quite frank. Why is that outrageous? You admitted that you had all the medical records by July 15. Correct. This was a new development, Your Honor. Up until that particular point, we were completely unaware that there was an alleged disc protrusion with the plaintiff. Up until that point, it was understood that we were just dealing with soft tissue injuries. It was the bombshell record on August 22, which was released by plaintiff, that we said, oh wait, whoa, we had no idea, disc protrusion. I mean, where did this come from? As you know, and as I've argued, this was produced after the August 15, 2019 deadline. Why didn't you move to continue the trial date and create a new CMO? Your Honor- I mean, that would have been the most, if this was truly the bombshell, uh, obviously the courts don't want this kind of thing going on. We don't want this. We don't want 900 pages of record for a simple auto case. So why didn't you just move to continue it? Well, Your Honor, it goes back to the motion that I originally filed for an extension of time. In my prayer, in the alternative, I said, if the court deems that we're not going to grant the motion for extension of time, alternatively, we would ask for continuance. During the oral arguments for a motion for extension of time, which plaintiff's counsel opposed, defense said, we have no objection to continuing trial, Your Honor. Opposing counsel presented very substantial arguments saying why they were entitled to have the trial on October 21st, 2019. They did not want this trial continued. Well, I mean, did you, um, are you talking about the transcript of, um, October 1? Correct, Your Honor. It's missing? October 1st, yeah, the motion for an extension of time. Nobody filed a bystander's report on that? I guess we did not, Your Honor. No bystander's report and no transcript? As far as I know, Your Honor. Right. So we're stuck with the record we've got. And your motion does not ask for a new trial date. The crux of your motion, as I read it, was, you know, we've got to, we've got this expert, we've got to do this report. We've got, we need more time to disclose. Right. And at that time, Your Honor, I would just like to add, we thought we had more or what we would be receiving a decision from the trial court before six weeks time. At the time we filed that, we believed we would get a decision more soon. Well, uh, I don't see any reason to stop moving along just because the court can't fit you in. But, um, anyway, uh, I appreciate, uh, your arguments, uh, your time, even the extra time we gave you, but, and I'm sorry about your computer, Mr. Beckwith. Yeah, thank you. If you're in your office, you ought to tell your bosses to, uh, partners to increase the bandwidth. I need to do that. Okay. I'm sorry. Uh, thank you for your arguments, counsel. Um, we'll take the matter under advisement and we'll issue an order in due course. We appreciate your arguments. Thank you. Have a great day. Thank you very much. Have a good day all.